UNITED STATES *v.* CHESTERTON CO. ET AL. (No. 2784)[1]

[1] T. D. 42232.

United States Court of Customs Appeals, May 27, 1927

*Charles D. Lawrence*, Assistant Attorney General (*Fred J. Carter*, specia attorney, of counsel), for the United States.
*Barnes, McKenna & Halstead* (*George J. Puckhafer* of counsel) for appellees.
*Lamb & Lerch* (*John G. Lerch* of counsel) *amici curiae.*

[Oral argument May 12, 1927, by Mr. Carter, Mr. Barnes, and Mr. Lerch]

Before GRAHAM, Presiding Judge, and SMITH, BARBER, BLAND, and HATFIELD, Associate Judges

GRAHAM, Presiding Judge, delivered the opinion of the court:

The appellee imported six shipments of glass tubes at various dates on and after October 15, 1924. These tubes were of varying sizes, ranging from 10 to 60 inches in length, and from three-eighths inch to three-fourths inch in diameter, the glass of which they were composed being, as shown by the illustrative exhibits before us, about one-eighth inch in thickness. The merchandise in protest 85511–G, invoiced as "red striped gauge glasses," has, covering about one-third of its outer surface, two parallel stripes of white with a narrower red stripe between and contiguous to said white stripes. These colors are vitrified upon the tubes after the tubes are made. The ends of each tube in all the shipments are fused and the merchandise is admittedly of blown glass.

The collector classified the merchandise, in each instance, as tubing, under paragraph 218 of the Tariff Act of 1922, which is as follows:

PAR. 218. Biological, chemical, metallurgical, pharmaceutical, and surgical articles and utensils of all kinds, including all scientific articles, utensils, tubing and rods, whether used for experimental purposes in hospitals, laboratories, schools or universities, colleges, or otherwise, all of the foregoing, finished or unfinished, composed wholly or in chief value of glass or paste, or a combination of glass and paste, 65 per centum ad valorem; illuminating articles of every description, including chimneys, globes, shades, and prisms, for use in connection with artificial illumination, all of the foregoing, finished or unfinished, composed wholly or in chief value of glass or. paste, or a combination of glass and paste, 60 per centum ad valorem; all glassware commercially known as plated or cased glass, composed of two or more layers of clear, opaque, colored, or semitranslucent glass, or combinations of the same, 60 per centum ad valorem; table and kitchen articles and utensils, and all articles of every description not specially provided for, composed wholly or in chief value of glass or paste, or combinations of glass and paste, blown or partly blown in the mold or otherwise, or colored, cut, engraved, etched, frosted, gilded, ground (except such grinding as is necessary for fitting stoppers or for purposes other than ornamentation), painted, printed in any manner, sand-blasted, silvered, stained, or decorated or ornamented in any manner, whether filled or unfilled, or whether their contents be dutiable or free, 55 per centum ad valorem; table and kitchen articles and utensils, composed wholly or in chief value of glass or paste, or a com-

bination of glass and paste, when pressed and unpolished, whether or not decorated or ornamented in any manner or ground (except such grinding as is necessary for fitting stoppers or for purposes other than ornamentation), whether filled or unfilled, or whether their contents be dutiable or free, 50 per centum ad valorem: *Provided*, That any of the articles specified in this paragraph, if containers of merchandise subject to an ad valorem rate of duty or to a rate of duty based in whole or in part upon the value thereof, shall be dutiable at the rate applicable to their contents, but not less than the rate provided for in this paragraph: *Provided further*, That for the purposes of this act, bottles with cut-glass stoppers shall with their stoppers be deemed entireties.

The importer protested, claiming the goods were dutiable as articles composed of blown glass, not specially provided for, under said paragraph, or manufactures of glass, not specially provided for, under paragraph 230 of said act. Alternative claims were also made under paragraphs 226, 227, and 228 of said act, but as these alternative claims were pressed neither in the court below nor here, no attention will be given to them.

The Board of General Appraisers, afterwards the United States Customs Court, the several protests having been consolidated, after hearing several witnesses, sustained the protests under said paragraph 218, holding the merchandise to be articles of blown glass, not specially provided for. From that judgment, the Government has appealed, making two principal contentions, first, that the word "tubing" found in paragraph 218, means any kind of glass tubing, and is not limited or restricted by the words preceding it in the paragraph; second, that, if such tubing be held to be so limited to such as is scientific, then the Government has brought itself within such a construction by proving that the tubes imported here are used for such last-named purpose.

The first portion of paragraph 218 is obviously intended to embrace all sorts of glass articles used for scientific purposes. The paragraph has been carefully prepared, and groups, in succeeding provisions, the various classes of glassware to be provided for. Thus, it provides for scientific glassware, illuminating articles, plated glassware, table and kitchen ware, articles not specially provided for composed of blown glass, and table and kitchen ware, pressed and unpolished, giving a distinctive rate of duty to each.

It will be observed that the statute recites the words: "Biological, chemical, metallurgical, pharmaceutical, and surgical articles and utensils, including," and follows with the disputed provision about tubes. This clearly evinces an intent to include only such articles as are of the general kind indicated by the preceding words. Again, the words "including all scientific articles, utensils, tubing, and rods," must in order to carry out the plain intent, be read as if it recited "scientific articles, scientific utensils, scientific tubing, and scientific rods." If this were not the construction, then any sort of glass tubing, glass

rods, or glass utensils might come within the language, for it will be observed that such articles come within the same, "whether used * * * in hospitals, * * * or otherwise," which must be construed, under the authorities, to mean whether so used *or not*. *United States* v. *Vandegrift*, 4 Ct. Cust. Appls. 226; *Gartner Sons & Co.* v. *United States*, 154 Fed. 957. If the Government's contention in this respect were correct, it would lead to the inclusion within this provision of all sorts of glass articles which plainly were not intended to be so included. We are therefore of the opinion that tubing, to be included within this provision in paragraph 218, must be scientific tubing.

What is or is not "scientific" tubing depends upon the common meaning to be attached to these words, unless altered by proof of commercial designation. We find no such proof of commercial designation in this record.

The words are thus defined in Webster's New International Dictionary (1925):

Scientific, *a.* 1. Of, pert. to or used in, science; as scientific apparatus.

Tubing, *n.* 2. A series of tubes; tubes, collectively; a length or piece of a tube; material for tubes; as, leather tubing.

Therefore "scientific tubing," as commonly understood, means a collective assembly of glass tubes, or material for glass tubes, which is of, or pertains to, or is used in, science. Whether the merchandise here imported is of such a character raises a question of fact, to be determined from the record.

Several witnesses were called and examined in the court below. It is shown by the testimony of Arthur W. Chesterton, president of the Advance Packing Co., and the importer in protest 85511–G, that the merchandise here is known as Sunderglass tubes, McGregor tubes, and by other trade names and is imported and used in its imported condition as gauge glasses for use on boilers to measure the height of the water therein, and that for 20 years he has so imported and sold them at wholesale and in large quantities. He further testified that the tubes were fused at the ends, were tested for pressure, and that the component materials of the tubes are a trade secret.

The Government attempted to meet this proof by calling several witnesses, persons connected with the manufacture and sale of scientific glassware and gauge glasses. None of these witnesses denied that the imported material was gauge glasses or used as the importer contended. Some of them did, however, testify that they had made scientific use of material which they claimed was similar to that imported here. John C. Carson, connected with Libby Glass Manufacturing Co., stated that his firm made low-pressure glass tubing for house-heating boilers, etc., and high-pressure tubing for locomo-

·tives, etc., and offered a sample of each, which he said had been sold in large quantities to Kimball Glass Co. Warren S. Hood, a representative of the Kimball Glass Co., stated that his firm made scientific instruments out of the material offered in evidence by Carson but did not make gauge glasses; that his company sells the same size tubing as that imported here but does not sell its tubing with reference to pressure resistance. To a similar effect was the testimony of Joseph F. Green, also with the Kimball Glass Co.

Pennock M. Way testified that he had been connected with Arthur G. Thomas Co., importers of laboratory apparatus, for 20 years; that his company sells scientific glassware, but not gauge glasses, and does not sell on a pressure test; and that while some of its glass would do for gauge glasses, he does not know how gauge glass is made.

Harry E. Mowen, with Greiner Co., manufacturers of scientific apparatus, testified that scientific apparatus was made by his company from material like that imported here; that the thickness of the glass rendered fabrication more difficult; that his company made gauge glasses out of the same material it used for scientific glassware, but that its gauge-glass trade was a very small part of its trade, and admitted that he did not know what the requirements of the gauge-glass trade were.

John C. Carson was recalled by the Government and testified that the tubes made by his company and sold to Libby are tested for pressure; that its gauge glasses went to a different class of trade from its scientific apparatus, namely, to railroad and boiler supply houses; that the gauge-glass trade had certain requirements as to length, etc., and such glasses are guaranteed by his company; that tubing to be cut and made into other tubing is sold by the ton, but completed gauge glasses are sold by the dozen; that all glass tubes are not suitable for gauge glasses.

Harrison F. Wilmot, a chemist, testified that he had used material like that imported here, in his laboratory, for connecting up apparatus where it was necessary to see the flow of a liquid through the connection.

We are unable to see how it may be said that the weight of the material part of this testimony favors the position that the imported merchandise is scientific tubing. Even if its character may be determined by chief use, there is no proof that the chief use of this merchandise is for scientific purposes—in fact, the proof is that all of it is used for gauge glasses. This record leads the mind to the conclusion that the importations in this case are distinctive, completed articles of commerce, used for and known as gauge glasses, such as have been before courts in former customs cases. T. D. 27884, 13 Treas. Dec. 109; Rogers v. United States, 115 Fed. 233, aff. in 121 Fed. 546; T. D. 32882, 23 Treas. Dec. 287. Various witnesses have stated that they have used similar-appearing tubes or tubing for

scientific purposes, but whether made the same they do not know. If it be admitted that some of the imported gauge glasses have been used to make scientific instruments, that does not in itself demonstrate that they are scientific tubing. To illustrate, a test tube may be made out of a gauge glass but the gauge glass does not, because of that possibility, lose its identity.

We have recently had a somewhat similar state of facts presented to us in *Nyman & Schultz v. United States*, 14 Ct. Cust. Appls. 432, T. D. 42060. In that case unfinished razor blades were imported and it was shown that a part of them, the proportion not being shown, was used for desk knives. The court, after citing many authorities, which it will not be necessary to re-cite here, said:

An examination of the sample before us, and a fair consideration of the testimony in the case, has brought us to the irresistible conclusion that these strips of steel, made as they are to possess the shape, size, and all of the necessary characteristics of unfinished blades for safety razors, are in fact unfinished safety-razor blades, notwithstanding the fact that as unfinished safety-razor blades they are used for other purposes. The fact that unfinished safety-razor blades may be used, as we think they are used, for window scrapers, or desk knives, does not make them any less unfinished safety-razor blades. We think they had been dedicated to a single use before reaching this country.

For the reasons suggested, we are of opinion that the court below came to a proper conclusion and its judgment is *affirmed*.