HEEMSOTH & BASSE, NICHOLAS WAPLER CO. *v.* UNITED STATES (No. 3971)[1]

United States Court of Customs and Patent Appeals, November 9, 1936

*Brown & Carter* (*Allan R. Brown, Fred J. Carter,* and *E. F. Blauvelt* of counsel) for appellants.

*Joseph R. Jackson,* Assistant Attorney General (*Charles D. Lawrence,* Special Assistant to the Attorney General, and *John J. McDermott,* special attorney, of counsel), for the United States.

[1] T. D. 48657.

[Oral argument October 9, 1936, by Mr. Carter and Mr. Lawrence]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

BLAND, Judge, delivered the opinion of the court:

Certain so-called aquarium thermometers, imported at the port of New York, were classified by the Collector of Customs under paragraph 218 (a) of the Tariff Act of 1930 as "scientific, chemical, or surgical articles," and assessed with duty at 85 per centum ad valorem.

The importers protested the classification and assessment of duty and claimed that the merchandise was dutiable under either of several paragraphs of said tariff act, among them being paragraph 218 (f) which provides for articles of blown glass at 60 per centum ad valorem. The claim under said paragraph 218 (f) is solely relied upon here.

The trial court overruled the protest and the importers have appealed here.

The competing provisions involved follow:

PAR. 218 (a) Biological, chemical, metallurgical, pharmaceutical, and surgical articles and utensils of all kinds, including all scientific articles, and utensils, whether used for experimental purposes in hospitals, laboratories, schools or universities, colleges, or otherwise, all the foregoing (except articles provided for in paragraph 217 or in subparagraph (e)), finished or unfinished, wholly or in chief value of glass, 85 per centum ad valorem; wholly or in chief value of fused quartz or fused silica, 50 per centum ad valorem.

  *   *   *   *   *   *   *

(f) Table and kitchen articles and utensils, and all articles of every description not specially provided for, composed wholly or in chief value of glass, blown or partly blown in the mold or otherwise, or colored, cut, engraved, etched, frosted, gilded, ground (except such grinding as is necessary for fitting stoppers or for purposes other than ornamentation) painted, printed in any manner, sand-blasted, silvered, stained, or decorated or ornamented in any manner, whether filled or unfilled, or whether their contents be dutiable or free, 60 per centum ad valorem.

Each of the so-called aquarium thermometers is about 4½ inches long and ⅜ inch thick at its thickest portion and is made up of two glass tubes. A small inner tube contains a red liquid, thought to be alcohol or some similar substance. It does not contain mercury. The larger tube in which the liquid-holding tube is placed has pasted or fastened to its inner walls a graduated thermometer scale printed on paper which is made to indicate the degree of temperature of the liquid into which the thermometer is placed. The thermometer shows a scale which is graduated in two-degree lines from twenty degrees up to a maximum of one hundred and forty degrees Fahrenheit. At the lower and smaller end of the large tube are what appear to be a number of small round balls resembling very fine shot intended to cause the thermometer to stand upright when floating in liquid.

The importers introduced the testimony of three witnesses to show the manner in which the thermometer was made, how it is used in

this country, and its lack of accuracy. These witnesses, in substance, stated that the instrument was used to determine the temperature of water in aquaria, usually household aquaria, and was especially designed for aquaria where tropical fish were kept, they not living in temperatures below fifty degrees Fahrenheit. One of the witnesses never saw it used in any other way, and stated that it was sold for use in aquaria in private homes.

The importers' testimony shows that in regulating the temperature of water for fish, the difference between sixty degrees and sixty-five degrees is immaterial; that the imported thermometars were regarded as sufficient for the intended purposes if they were accurate within two or three degrees; and that many of them varied as much as ten degrees.

The Government introduced the testimony of two witnesses who testified as to how thermometers were made and tested in this country. The testimony of these witnesses indicates that generally in the manufacture of thermometers in this country more accuracy is required than was indicated by the testimony of appellants' witnesses, but that the school type of thermometer might have an inaccuracy up to two degrees; that this kind of thermometer (the school type) was also used in the laboratory of sugar industries and of chocolate manufacturers; and that "precision thermometers," which they manufactured, were accurate to within one scale division—that is, the distance between two lines—and were more accurate than the so-called school thermometers.

Government witness Todtschinder stated that he tested Exhibit 1, which is representative of the importation at bar, and that the tests showed that the reading of the imported thermometer compared exactly with the standard instrument of the Bureau of Standards, with which it was tested, when read at a temperature of seventy degrees Fahrenheit.

Government witness Moeller testified that the imported thermometer might be used for many purposes; that he had never seen it used in a chemical laboratory but had seen it used in hospitals, and that he had used it himself in taking a bath; that when used in hospitals it is known as a bath thermometer; that he had seen thermometers similar to Exhibit 1 made and tested in Germany and that Exhibit 1 "approximately corresponded with the standard thermometer" referred to by witness Todtschinder.

It is the contention of the importers here that the involved article cannot be classified under paragraph 218(a), first, because it is not a scientific article or utensil; and second, because if it is a scientific article or utensil, it is not a biological, chemical, metallurgical, pharmaceutical, or surgical one. As to the first contention, it is urged,

in substance, that science implies accuracy, and that the inaccuracy of the imported article renders it unscientific.

We think appellants' contention that the imported thermometers are not scientific articles for the reason that they are inaccurate is without merit. Many articles used in science are sometimes cheaply and imperfectly made and necessarily ofttimes inaccurate. They may not perform or help to perform a scientific experiment or function as efficiently as a more accurate or a better constructed one would do, but the degree of accuracy with which the article performs should not be the test as to whether or not it is in fact a scientific article.

This court has, in the past, when construing this paragraph, regarded thermometers as scientific instruments. In *United States* v. *Schaeffer & Budenburg Corp.*, 18 C. C. P. A. (Customs) 338, T. D. 44587, this court had under consideration certain glass tubing used chiefly in the manufacture of thermometers. The appraiser's report stated that the tubing was used for thermometers in hospitals, laboratories, schools, universities, etc. The court said:

The language of this provision is "scientific * * * tubing and rods." It is not disputed that thermometers are scientific instruments. This tubing must be considered as to its condition when it entered our customs jurisdiction. It was then glass tubing, intended for and dedicated to, a scientific use. * * *

In the instant case, the record shows that the thermometers involved may be and are used in hospitals in connection with the bath of patients. It is obvious that they could also be used for the same purpose in homes. In view of our holding in *United States* v. *Schaeffer & Budenburg Corp.*, *supra*, that the thermometer glass tubing therein involved was scientific, we think we are fully justified in concluding in this case that the thermometers at bar are scientific articles. It would lead to anomalous results to hold that a thermometer was not a scientific article, within the purview of paragraph 218 (a), *supra*, because it happened that it was more suited to taking the temperature of the water in the bath and the aquarium than for any other of the well-known purposes of various kinds of thermometers. If an instrument designed and used for taking temperatures is a scientific article, and we think this is the effect of the holding of this court in the cases above cited, then a thermometer such as the one at bar must be such an article, regardless of the fact that it might be used chiefly in the household aquarium.

In appellants' second contention, a question is raised which has not been directly presented before to this court, and we think a decision of the issue presented calls for a construction of the following language in said paragraph 218 (a):

Biological, chemical, metallurgical, pharmaceutical, and surgical articles and utensils of all kinds, including all scientific articles, and utensils, whether used for experimental purposes in hospitals, laboratories, schools or universities, colleges, or otherwise * * *.

The language above quoted from said paragraph 218 (a) is not very clear, and it would be difficult to state definitely exactly why Congress should have seen fit to have used some of the terms therein contained and placed them in the order in which we find them in the paragraph. In the first place, biological, chemical, metallurgical, pharmaceutical, and surgical articles and utensils of all kinds are provided for, and then follows the phrase "including all scientific articles, and utensils." Now, up to this point it is our view that the intent of the framers of the paragraph would have been clearer if the language had read "all scientific articles and utensils, including biological, chemical, metallurgical, pharmaceutical, and surgical articles and utensils." By inverting the terms, we do not think Congress intended to restrict the term "all scientific articles and utensils" to those used in the five specially named categories. If it so intended, it could have accomplished its purpose by omitting the phrase "all scientific articles and utensils" from the paragraph. Rather, we think, Congress intended not only to include biological, chemical, metallurgical, pharmaceutical, and surgical articles and utensils of all kinds, but that it intended to include such scientific articles, tubes, and rods, as were in fact scientific whether they were used in hospitals or anywhere else. It will be noticed that after Congress had used the term of extension "including all scientific articles," it broadened the scope of the whole paragraph by including them whether they were used in hospitals, laboratories, schools or universities, or colleges, and then further broadened them by the term "or otherwise," which was equivalent to stating that such articles should be included therein no matter where or how used so long as they were scientific articles.

As bearing upon the issue, both sides have discussed and quoted from the case of *United States* v. *Chesterton Co. et al.*, 15 Ct. Cust. Appls. 175, T. D. 42232. We there had under consideration glass tubes, ranging from 10 to 60 inches in length, and from three-eighths inch to three-fourths inch in diameter, invoiced as "red striped gauge glasses." In affirming the decision of the trial court we held that the glass tubing which was used for the gauge glasses for boilers to measure the height of the water, was not scientific tubing, since the glass gauge was not a scientific article, and we there said:

It will be observed that the statute recites the words: "Biological, chemical, metallurgical, pharmaceutical, and surgical articles and utensils, including," and follows with the disputed provision about tubes. This clearly evinces an intent to include only such articles as are of the general kind indicated by the preceding words. Again, the words "including all scientific articles, utensils, tubing, and rods," must in order to carry out the plain intent, be read as if it recited "scientific articles, scientific utensils, scientific tubing, and scientific rods." * * *

The case of *W. L. Conover* v. *United States*, 17 C. C. P. A. (Customs) 324, T. D. 43743, is alluded to by counsel for both the Government

and the importers. That case involved seismographs, and we held upon that record that a seismograph is a scientific instrument, although it was shown that it had been used for a short period of time by two oil companies in connection with locating oil underneath the ground. We find little in this case that has any bearing on the issues at bar. Paragraph 360 rather than paragraph 218 (a) was there involved.

We think the trial court was right in concluding that the involved thermometers were scientific articles, and had been properly classified by the collector, and its judgment is *affirmed*.