(C. D. 1571)

G. L. RAMSEY a/c JUVENILE MFG. Co. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided December 23, 1953)

*Lang, Byrd, Cross & Ladon* and *Philip Stein* (*Philip Stein* and *Marjorie M. Shostak* of counsel) for the plaintiff.

*Warren E. Burger*, Assistant Attorney General (*Joseph E. Weil* and *Richard H. Welsh*, special attorneys), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

FORD, Judge: The merchandise covered by the suit listed above was classified by the collector as "Parts of embroidered cotton wearing apparel" and duty was levied thereon at the rate of 90 per centum ad valorem under the provisions of paragraph 1529 (a) of the Tariff Act of 1930. The plaintiff claims said merchandise to be properly dutiable at 75 per centum ad valorem under said paragraph 1529 (a), as modified by the trade agreement with France, 69 Treas. Dec. 853, T. D. 48316, as articles of wearing apparel, finished or unfinished, wholly or in chief value of cotton, embroidered.

At the trial, there was received in evidence, as collective illustrative exhibit 1, five samples of the involved merchandise, and one witness testified for the plaintiff. The weight of the testimony establishes the following: That Harold M. Scherr, the witness who testified, was the general manager of the plaintiff herein since 1945, had been with the company since 1936, and was familiar with the entries involved in this case; that the business of Juvenile Mfg. Co. is the manufacture of infants' and children's clothing and that the articles represented by plaintiff's collective illustrative exhibit 1 are samples of the type of merchandise they manufactured; that Mr. Scherr was the manager of production of plaintiff company and personally saw the merchandise manufactured; and that he was familiar with the technical proc-

esses in the manufacture of the exhibits from the outset, having seen them performed in his own plant. He described these processes as follows:

A sketch is first made of the articles to be produced, and, when the sketch is accepted, the cotton materials are purchased from American sources, threads, buttons, etc., are coordinated, and the materials are cut in conformity with the original designer's sketch. The material is obtained from the mills in what is commonly known as bookfold bolts. Paper patterns are made from the designer's sketch, graded into pattern sizes, and cut to form the actual size of the garments. The material is spread to heights of 500 to 600 ply, and the paper pattern is then laid over the material. A marker then traces the outline of the paper patterns on the material with a marking crayon or pencil, and, after the tracing is completed, the paper pattern is removed.

The next process is the actual cutting, which is done with an electrical knife, commonly called a cutting machine, and this produces the complete garments, consisting of the front, back, and sleeves. After this, the ornamental design originally created by the designer is stamped on the front for guidance when the embroidery is applied in Mexico. An equal number of fronts, backs, and sleeves is cut for each individual garment that is ultimately to be made. The sleeves and back are earmarked to go with the specific fronts, according to bundle, after it is returned from Mexico.

The fronts are then sent to Mexico for embroidery work to be done, while the backs and sleeves, which are cut at the same time, are put aside in sequence and marked serially so that when the fronts are returned it is a simple process to match the fronts with the backs and sleeves. The fronts are also marked so that they can be connected up with the sleeves and backs. This marking has to be done because the sizes have to be matched. A size zero front has to go with a size zero back and could not be used with any other size. Each piece is marked to show that it belongs with the other pieces with which it was simultaneously cut.

When the dress fronts are returned to the importer, after having been embroidered in Mexico, they go through a matching process for size, color, and shade. After matching the backs and sleeves previously cut, the side seams are sewn, the sleeves previously cut are set into the armpits, the hem is put in, the neckband is finished with a piece of piping, or some other process, depending upon the design, and, if buttons or buttonholes are required, they are installed, and the garments are pressed and packaged.

If neckbands are used in the design, they are cut at the same time as the fronts, backs, and sleeves and marked accordingly. The sleeves, fronts, backs, and collars or neckbands, are definitely dedicated to one

particular purpose, the ultimate production of baby wearing apparel. After they are cut from the piece of cloth in the bolt, they are suitable and usable for no other purpose than that for which they were originally designed. When the fronts, backs, sleeves, and neckbands are cut, they are dedicated solely for use in making a certain size and shade of infants' dresses. These dress fronts are not sold as separate items. The completed article is what is delivered.

There appears to be little, if any disagreement between counsel for the respective parties regarding the facts established herein. As heretofore stated, only one witness was offered by the plaintiff, the defendant being content with its cross-examination of plaintiff's witness. Much of the testimony adduced on cross-examination supports the contention of counsel for the plaintiff, and none of such testimony is in conflict with that given on direct examination. However, there is sharp disagreement between counsel on the question of law as to whether the involved merchandise consists of articles of wearing apparel, unfinished, embroidered, or articles, embroidered, other than wearing apparel, unfinished.

The pertinent part of said paragraph 1529 (a) under which the merchandise was classified reads as follows:

* * * fabrics and articles embroidered * * * and fabrics and articles wholly or in part thereof, finished or unfinished * * * by whatever name known, and to whatever use applied, and whether or not named, described, or provided for elsewhere in this Act, when composed wholly or in chief value of filaments, yarns, threads * * * 90 per centum ad valorem.

Said paragraph 1529 (a), as modified, *supra*, reads as follows:

Articles of wearing apparel, finished or unfinished, wholly or in chief value of cotton or silk, however provided for in paragraph 1529 (a), in whole or in part of machine-made lace, or embroidered * * * or from which threads have been omitted, drawn, punched, or cut, and with threads introduced after weaving to finish or ornament the open-work, not including one row of straight hemstitching adjoining the hem, 75% ad val.

Based upon this record, counsel for the plaintiff contends that:

* * * the record as made herein establishes that the articles at bar have been cut to shape to fit the body of an infant, are dedicated solely to use as infants' wear, and are not usable for any other purpose; that they require no further cutting or shaping after importation, but only assembling, sewing, and finishing to constitute them as *finished* articles of wearing apparel; and that accordingly they consist of *articles of wearing apparel, unfinished*, dutiable under the specific provision therefor added to Paragraph 1529 (a) by the French Trade Agreement, as claimed by the plaintiff in its protest herein, rather than under the provision of Paragraph 1529 (a) of the Tariff Act of 1930 as articles, embroidered, finished or unfinished, as assessed by the collector.

It is the contention of counsel for the defendant that:

The involved baby dress fronts are merely unfinished articles, embroidered, and not articles of wearing apparel, either finished or unfinished.

In support of its contention, counsel for the plaintiff cites us to the cases of *Ordway* v. *Wilbur,* 16 Me. (4 Shep.) 263, 264, 33 Am. Dec. 663; *In re Mills et al.,* 56 Fed. 820; *Meyer* v. *United States,* 124 Fed. 296; *United States* v. *Snow's United States Sample Express Co.,* 6 Ct. Cust. Appls. 120, T. D. 35388; *Oppenheimer* v. *United States,* 61 Fed. 283, affirmed in 66 Fed. 52; *J. Sachs & Co.* v. *United States,* 24 Treas. Dec. 670, T. D. 33406, G. A. 7460; *Campbell, Metzger & Jacobson* v. *United States,* 26 Treas. Dec. 371, T. D. 34243, G. A. 7537; *United States* v. *Horni Signal Mfg. Co., Inc.,* 27 C. C. P. A. (Customs) 316, C. A. D. 106; *United States* v. *Schaeffer & Budenburg Corp.,* 18 C. C. P. A. (Customs) 338, T. D. 44587; and *United States* v. *Cartier (Inc.),* 15 Ct. Cust. Appls. 334, T. D. 42493.

Counsel for the defendant cites in support of its contention *Redden & Martin* v. *United States,* 5 Ct. Cust. Appls. 485, T. D. 35147; *Nyman & Schultz* v. *United States,* 14 Ct. Cust. Appls. 432, T. D. 42060; *Sand & Siman* v. *United States,* 73 Treas. Dec. 901, T. D. 49594; and *Bata Shoe Co., Inc.* v. *United States,* 6 Cust. Ct. 50, C. D. 423.

In the *Ordway* case, *supra,* the court observed that:

* * * A construction of the statute so liberal as to allow it to be perverted to fraudulent purposes, should be avoided, while one so strict as to defeat the object designed ought not to prevail. Apparel, it is said, means dress, clothing, vestments, garments; and hence it is inferred, that nothing is comprehended in the term, but such as are in a fit state to be worn or used as such. A construction so strict would not exempt a garment wholly or partially in pieces for repair or alteration. When cloth has assumed the form and shape to fit it to the body of a particular person, may it not be regarded as his vestment, although not in a condition at that time to be worn? If the tailor had made a charge of his services, would he not have charged for "cutting a coat"? When handing it to his journeyman to be sewed, would he not speak of it as a "coat to be made"? And if so, must it not, in the popular language used by the trade, be regarded as a coat and part of the plaintiff's apparel?

In the *Ordway* case, the merchandise involved consisted of 2 yards of broadcloth which the plaintiff had procured for a coat for himself and had given to the tailor, who had taken his measure and cut the cloth; but before it was made into a coat the defendant attached it.

In the *Mills* case, *supra,* the merchandise consisted of cotton hem-stitched lawns, imported in pieces from 28 to 30 yards in length, and 45 inches wide, having broad hems about 5 inches wide on one side of the fabric. The merchandise was chiefly used for making women's and girls' dresses, skirts, and aprons, although it was shown that the fabric was susceptible of use in making curtains. In disposing of that case, the court employed the following language:

* * * With regard to the use of the phrase "made up wholly or in part,"—that is, as to these partly made up articles,—I think the true criterion when it is applied to wearing apparel is this: That it must at least be made up sufficiently

far to enable us to identify the particular article of wearing apparel that is going to be made out of it. We cannot tell from this article whether it is a partly made up skirt or apron, or some other gown; and, until the process of partly making has progressed far enough along to enable us to say what particular piece of wearing apparel it is, I do not see how we can call it wearing apparel partly made up, especially as it is still susceptible for use for making curtains.

In the *Sachs* case, *supra*, the merchandise consisted of a foundation fabric of silk voile with raised pile surfaces in designs of ladies' collars and cuffs. The goods were imported in pieces several meters in length, and the collars and cuffs were repeated in sets throughout the length of the piece at regular intervals of about 17 inches apart, the width of the goods being such as to allow for 2 collars and 2 pairs of cuffs within the length of 17 inches. In separating the articles into individual collars and cuffs, it was only necessary to cut them from the piece.

The importer contended that the merchandise, as imported, might be put to various uses other than as wearing apparel, and that it was, therefore, not dutiable as wearing apparel.

In holding the merchandise to be wearing apparel, the court observed that:

Paragraph 402, under which the assessment was made, provides *inter alia* for "clothing ready made, and articles of wearing apparel of every description, including knit goods, made up or manufactured in whole or in part by the tailor, seamstress, or manufacturer." This provision does not refer to completed articles only, because the language is "made up or manufactured in whole or in part by the * * * manufacturer." * * *

In construing the phrase "made up wholly or in part" in Mills's case in the United States Circuit Court for the Southern District of New York (56 Fed. 820), Judge Lacombe used this language:

I think the true criterion when it is applied to wearing apparel is this: That it must at least be made up sufficiently far to enable us to identify the particular article of wearing apparel that is going to be made out of it.

An inspection of the sample in this case convinces us that the merchandise is sufficiently advanced in manufacture to render certain that it is designed for use exclusively as ladies' collars and cuffs. Collars and cuffs are manifestly wearing apparel, and the goods here in question being collars and cuffs, which have only to be cut from the piece in order to be ready for use, were properly classified as partly made wearing apparel. Robinson *v.* United States (122 Fed., 970); Kaskel & Kaskel, G. A. 6116 (T. D. 26613) and authorities there cited.

With reference to the *Horni Signal Mfg. Co.* case, *supra*, we quote the following from the brief of plaintiff:

* * * ball-like forms of glass used to form words or symbols in road signs, designed to reflect light when headlights of automobiles shine on them, *by reason of material placed on the back of the articles after importation* making mirrors of them, were held to be "illuminating articles of every description, finished or unfinished" in *their condition as imported*, even though in that condition they do not illuminate anything, because at the time of importation, they were nevertheless dedicated to the chief use of making glass reflectors to be used in road signs. The Court there

indicated that the question to be decided was whether, when finished for their ultimate use, the imported merchandise would be regarded as illuminating articles for use in connection with artificial illumination, and answered in the affirmative, since, *even in their unfinished state, the articles were nevertheless dedicated to a chief use, when finished* in connection with artificial illumination, thus satisfying the requirements of the statute.

In the *Schaeffer* case, *supra,* the merchandise consisted of tubing for thermometers, composed wholly or in chief value of glass or paste, or a combination of glass and paste, used in hospitals, laboratories, schools, universities, etc., which had been classified as scientific tubing under the first duty provision of paragraph 218 of the Tariff Act of 1922. It was claimed to be dutiable as articles, not specially provided for, under another duty provision of the same paragraph. Holding the merchandise to be scientific tubing, the Court of Customs and Patent Appeals said:

The court below based its decision upon the theory that the first duty provision of said paragraph 218 does not provide for *parts* of scientific articles and utensils, and that, therefore, under a familiar rule in customs adjudication, it will be taken that the Congress did not intend such parts to be so included. These being parts of thermometers, the court holds they are not included as such within said duty provision. Again, the court holds that they can not be classified as *unfinished* scientific articles, because, to come within that provision, they must be wholly or in chief value of glass or paste, or a combination thereof; there being no proof in the record as to chief value, or as to the other elements entering into said thermometer, they are, therefore, not within the category of unfinished scientific articles. Finally, the court holds, as we understand it, basing its conclusion largely upon *United States* v. *Chesterton Co.,* 15 Ct. Cust. Appls. 175, T. D. 42232, that these articles can not be considered as scientific tubing because they are not used as imported, for scientific purposes, but merely as material to make parts of scientific instruments. This is also the argument of appellee here.

We are of opinion this is too narrow a construction of this provision of law. In *United States* v. *Chesterton Co., supra,* we had before us certain glass tubes, imported, and chiefly used for gauge glasses in water boilers. There was some attempt to show that some of these tubes had, at times, been used for scientific purposes, but this was, clearly, only a fugitive use. In passing upon the matter we came to the conclusion that tubing, to be included within the first duty provision of said paragraph 218, must be scientific tubing, the common meaning of which term we stated as follows:

Therefore "scientific tubing," as commonly understood, means a collective assembly of glass tubes, or material for glass tubes, which is of, or pertains to, or is used in, science. Whether the merchandise here imported is of such a character raises a question of fact, to be determined from the record.

Later, in answer to some suggestions made by counsel for appellant, we said:

If it be admitted that some of the imported gauge glasses have been used to make scientific instruments, that does not in itself demonstrate that they are scientific tubing. To illustrate, a test tube may be made out of a gauge glass but the gauge glass does not, because of that possibility, lose its identity.

This was not intended by the court to amount to a holding that if a piece of tubing was to be used as material for making a scientific instrument, it could not be classified, on that account, as scientific tubing. It was merely an expression

by the court of the thought that a fugitive or occasional use of the tubing for making scientific instruments did not make it subject to classification as scientific instruments.

The language of this provision is "scientific * * * tubing and rods." It is not disputed that thermometers are scientific instruments. This tubing must be considered as to its condition when it entered our customs jurisdiction. It was then glass tubing, intended for and dedicated to, a scientific use. The mere fact that it was afterward combined with other materials to make it capable of its scientific purpose, does not, in our opinion, make it any the less scientific tubing. It is a matter of common knowledge that glass tubing, of various lengths and sizes, is used in scientific work in connection with rubber tubing and other appliances, to make scientific instruments and to perform scientific experiments. The fact that such tubing cannot be so used by itself does not render it any the less scientific tubing. The test is its chief use. The purpose of this paragraph, in our opinion, was to include all such tubing.

To the same effect is the decision in the *Oppenheimer* case, *supra*, wherein was involved the proper classification of silk veils in the piece, in rolls several yards long, ornamented with a succession of borders, each surrounding a portion of the fabric of a size suitable for a veil. While the series of veils thus marked were not separated from each other at the time of importation, they were shown to be adapted to no other use than as veils, and required only to be cut apart to make completed veils, the dividing line between each being indicated. The court there held that since the articles were manufactured, adapted, and intended for veils and nothing else, the operation of their manufacture having progressed so far as to identify the particular article of wearing apparel it was to be, and the evidence showing that they were practically useless for any other purpose, they were held to have been properly assessed by the collector as articles of wearing apparel of silk, made up or manufactured wholly or in part.

If, as held in the *Ordway* case, *supra*, 2 yards of broadcloth which had been given to the tailor who had taken the person's measure and cut the cloth, but before it was made into a coat, was wearing apparel, we see no escape from the conclusion that the involved merchandise is also wearing apparel. True, it is not finished, but under the statute it does not have to be finished, since it is provided for as wearing apparel, unfinished, embroidered.

An examination of the sample before us, collective illustrative exhibit 1, leaves no doubt as to the particular article of wearing apparel that is going to be made out of the involved merchandise. Therefore, the involved merchandise answers all the requirements of the definition of "wearing apparel," found in the *Mills* case, *supra*. This merchandise has been made up at least sufficiently far to enable us to identify the particular article of wearing apparel that is going to be made out of it. We can tell from this particular article whether it is a partly made up skirt, apron, gown, dress, or some other article of wearing apparel.

Unquestionably, the involved merchandise at the time of importation was clearly dedicated to but one use—to the making of baby dresses—and if, in its unfinished state, it was dedicated to a chief use, when finished, in connection with making wearing apparel, the requirements of the statute would be met. *United States* v. *Horni Signal Mfg. Co., supra.*

In the *Cartier* case, *supra,* the merchandise consisted of an article, composed of crystal and rectangular links, fitted with a metal device to fasten the article around the wrist. The court held this merchandise to be a part of a bracelet "* * * which has been so far advanced that in order to constitute it a completed bracelet nothing remains to be done, according to the evidence, except to mount diamonds of appropriate sizes in the places provided therefor on the platinum links."

In holding this merchandise to be jewelry, unfinished, the Court of Customs Appeals said:

Certainly a part of jewelry, such as that involved in this case, which has been so far advanced as to unmistakably indicate the particular article of jewelry which it will become when completed and which is commercially unfitted in its condition as imported for the making of anything else, is unfinished jewelry. A platinum wristlet, designed to be worn on the wrist as an ornament when the settings thereon provided have been filled with precious stones, is finally commercially committed not only to the manufacture of jewelry but to the making of that particular kind of jewelry known as a bracelet. The unfinished bracelet is, consequently, unfinished jewelry. * * *

When the law, as announced in the *Cartier* case, *supra,* regarding what constitutes jewelry, unfinished, is applied to the facts in this case its controlling effect is readily apparent. The same may be said with reference to the *Nyman & Schultz* case, *supra.*

Upon a full consideration of the record before us, and in consonance with the authorities alluded to herein, we hold the merchandise covered by this protest which was classified as "Parts of embroidered cotton wearing apparel," and assessed with duty at 90 per centum ad valorem under paragraph 1529 (a) of the Tariff Act of 1930, to be properly dutiable at 75 per centum ad valorem under said paragraph 1529 (a), *supra,* as modified by the trade agreement with France, *supra,* as alleged by the plaintiff.

To the extent indicated the specified claim in this suit is sustained; in all other respects and as to all other merchandise all the claims are overruled. Judgment will be rendered accordingly.