(C. D. 1849)

PARAMOUNT IMPORT EXPORT CO. | PARAMOUNT IMPORT CO., INC. } *v.* UNITED STATES

United States Customs Court, Third Division

(Decided February 26, 1957)

*Barnes, Richardson & Colburn (E. Thomas Honey* of counsel) for the plaintiffs.
*George Cochran Doub,* Assistant Attorney General (*Dorothy C. Bennett,* trial attorney), for the defendant.

Before JOHNSON and DONLON, Judges

DONLON, Judge: These protests, consolidated for trial (R. 2), relate to merchandise imported in 1953 from Japan. The invoices described the merchandise as disks, either as shell disks or mother-of-pearl disks.

The appraiser returned the merchandise as shell button blanks, faced and turned, not drilled. The collector classified the merchandise as partly finished shell buttons, dutiable under paragraph 1509 of the Tariff Act of 1930 at 1¾ cents per line per gross, plus 25 per centum ad valorem.

Plaintiffs claim that their merchandise should be classified either (1) as manufactures of mother-of-pearl or of shell, not specially provided for, or (2) as shell and pieces of shell, engraved, cut, ornamented, or otherwise manufactured, subject to duty (for either classification) at 17½ per centum ad valorem under paragraph 1538 of the Tariff Act of 1930, as modified by the Annecy Protocol of Terms of Accession to the General Agreement on Tariffs and Trade (T. D. 52373) and the President's proclamation of May 13, 1950 (T. D. 52476), effective May 30, 1950.

Plaintiff, in protest 229998–K only, also claimed classification of that merchandise as spangles and beads, under paragraph 1503 of the Tariff Act of 1930, as modified. This claim was not pressed at the trial nor was it discussed in the briefs. Therefore, it is deemed abandoned.

The disks, generally described in the invoices as shell or mother-of-pearl and all without drilled holes, are further described by line in the invoices attached to the entries. "Line" is a term of measurement and is part of the basis for assessing specific duty under paragraph 1509. In the table of measures published in Webster's New International Dictionary, second edition, "line" is defined as a button measure, used in the United States, equivalent to ¼₀ inch.

Protest 229116–K covers disks of several line sizes. Some are twenty-two (22) line size; some twenty-eight (28) line size; and some thirty-four (34) line size. Exhibit 1, introduced by plaintiffs, is said to be representative of the "28 line, no hole" disks that were imported and to be the same in all respects, save line size, as the "22 line" and "34 line" disks included under this protest. (R. 3, 4.)

Protest 229998–K likewise covers disks of different line sizes. Part is 16 line size, and part is 36 line size. Plaintiffs' exhibit 2 is said to be representative of the "36 line, no hole" disks imported and

to be the same in all respects, save line size, as the "16 line" disks included under this protest. (R. 4, 5.)

Witnesses testified for both parties.

It appears from testimony that the term "disk," as applied to this merchandise, is a relatively new term. There is testimony that this term dated from not earlier than 1938. Such disks previously had been known as blanks; and that term, "blanks," still is the term most widely used for this merchandise. (R. 71.)

Whether called "disks" or "blanks," the merchandise, as imported, is produced by a method described in testimony substantially as follows: Trocas shells are cut into blanks of various sizes, so as to utilize the shell area. Both sides of these blanks are then ground. Grinding is done in order to make the blanks even. Next, the ground blanks are graded for thickness and for size.

If blanks are to be used for sew-through buttons, they are usually faced, that is, a design is cut and holes for thread are drilled through the blank. If holes are to be drilled, the facing and drilling operation follows grading and precedes the operation of polishing and bleaching. (R. 43, 44.) These blanks were not drilled.

There is some evidence that holes may be drilled through a blank, following polishing, for the pin-shank type of button.

If blanks are to be used for shank buttons (other than pin shanks), or for any use that does not require holes drilled through the blank, the drilling operation is, of course, omitted.

Exhibit 1 has thickness of about 3½ lines. (R. 69.) It is a finished blank, that is, it is polished and bleached. It has not been drilled with holes. Prior to polishing, it might have been made into form for use to make a sew-through button, by drilling holes in the blank. (R. 50.) Exhibit 2 has thickness of 2 lines. It is a thinner blank than exhibit 1, and it also could have been made into a blank for use as a sew-through button. However, if holes were drilled through after the polishing operation, there is testimony that the risk of breakage would make that sequence of operations uneconomic. (R. 51, 64.)

In the condition in which imported, the merchandise represented by exhibits 1 and 2 was concededly not in the form usual for blanks used to make the kind of button that is fastened to a garment by sewing through the button. The merchandise is, however, in a form in which it might be used for making shank buttons and, outside the garment industry and retail button trade, for buttons on musical instruments and for elevator pushbuttons, as inlays, and in the jewelry industry. (R. 42, 63, 71.)

The main contention advanced by plaintiffs is that this merchandise, in condition as imported, is not exclusively dedicated to the manufacture of buttons, but is merchandise that can be used variously, and that this merchandise was, in fact, used to make jewelry. The

plaintiffs appear to argue that, where an article is used to make more than one thing and, therefore, is not exclusively dedicated to the making of one particular article, it cannot be, for purposes of tariff classification, that particular article in a partly finished form. Cases cited are: *United States* v. *The Harding Co.*, 21 C. C. P. A. (Customs) 307, T. D. 46830; *Nyman & Schultz* v. *United States*, 14 Ct. Cust. Appls. 432, T. D. 42060.

Defendant argues that the *eo nomine* provision for buttons, partly finished, is not limited to merchandise intended for use as sew-through garment fasteners, but embraces all articles within the common 1930 meaning of the term. Defendant cites *L. H. Arens* v. *United States*, 4 Cust. Ct. 331, C. D. 355; *Harlem Adler Co., Inc.* v. *United States*, 73 Treas. Dec. 123, T. D. 49362.

The issue here is whether the general provision for manufactures of shell prevails over the *eo nomine* provision for buttons, partly finished. Obviously, a button of shell material is, at the same time, a manufacture of shell. If a certain type of manufacture of a material is *eo nomine* provided, the article in that form should be classified under the *eo nomine* provision and not under the general provision. That is, *eo nomine* provision prevails over a general provision.

Plaintiffs, however, do not concede that this particular manufacture is *eo nomine* provided for in the law. They argue that an article which is shown to have various uses, as here, should not be deemed classified *eo nomine*, even though there is *eo nomine* provision for that article in one of its uses. No case is cited for that proposition.

In *Worthington* v. *Robbins*, 139 U. S. 337, the merchandise was white hard enamel, imported for use in making watch dials, but adaptable also to a variety of other uses. The collector classified the merchandise as watch materials, not specially provided for. Plaintiff claimed classification as articles, manufactured in whole or in part, not enumerated or provided for. It was developed in the testimony that neither the form nor condition of the imported merchandise gave evidence or indication of its use, nor was it adaptable (in the form and condition in which it was imported) for use in making watch dials, without further processing or manufacture. Holding for the plaintiff, the Supreme Court pointed out that mere examination of the imported article did not reveal to what uses the merchandise could be applied; that dutiable classification must be determined on examination of the imported article; that, in order to be "watch materials," the article must in itself bear marks of its special adaptation for use in making watches. The Court said that the fact the article was used in the manufacture of watches had no relation to its condition as imported, but only to what the importer afterwards did with it. (P. 341.)

The rule laid down by the Supreme Court in the *Worthington* case, *supra*, has been extended to resolve competition between manufactures

of asbestos and parts of automobiles, finished or unfinished, *United States* v. *The Harding Co., supra*; between provision for unfinished razor blades and manufactures of metal, *Nyman & Schultz* v. *United States, supra*; and between provision for wearing apparel, unfinished, and parts of embroidered wearing apparel, *G. L. Ramsey a/c Juvenile Mfg. Co.* v. *United States*, 31 Cust. Ct. 201, C. D. 1571, affirmed in *United States* v. *G. L. Ramsey a/c Juvenile Mfg. Co.*, 42 C. C. P. A. (Customs) 106, C. A. D. 580.

No one of those cases, however, supports so broad an application of the *Worthington* rule as plaintiffs here urge.

The true test, in our opinion, is indeed laid down in *Worthington* v. *Robbins, supra.* If imported articles bear marks of special adaptation for use in making buttons, and such use is substantial and long continued, then, the fact that the articles could be used, and in this case actually were used, to make jewelry, has no relation to the condition of the articles, as imported, but only to what the importer afterwards did with them.

It appears that these disks, or blanks, as they were partly finished abroad, were cut in the same operation as that for processing button blanks, and that each subsequent operation before importation was the same operation as is usually performed for button blanks. If these disks are not within the *eo nomine* provision for buttons, it must be solely because the operation of polishing was performed without having holes first drilled through the disks. Yet, the record shows that disks, or blanks, such as these, imported without holes, have substantial use in making various types of buttons. Not all buttons, and not even all garment fasteners, have holes drilled through.

Our appeals court considered, in *Konishi Kotakudo Co. (Inc.)* v. *United States*, 17 C. C. P. A. (Customs) 355, T. D. 43798, the question whether an imported article may be classified as a manufacture of anything, if the record shows that it has not been dedicated to an "exclusive" use. All judges concurred in the result, but the majority and concurring opinions sharply expose the divergence of view that gives rise to the litigation now before us. The majority found as fact that "the imported merchandise does not have several uses, but that each particular item has its own exclusive use. In other words, at the time it enters the commerce of this country, it is dedicated to a particular use and has therefore become, in every sense, a manufacture of glass." (P. 358.) On this finding of fact, the majority of the court laid down the rule as follows:

This court is committed to the doctrine that an imported article may be classified as a manufacture of anything only when it has been dedicated to some exclusive use. * * * For instance, it need not be shown, in the case at bar, that the imported articles are advanced to the point where they are dedicated to the use of any one kind of watch crystals; if they can be used for watch crystals, generally, that is sufficient.

The only remaining question is whether one exclusive use has been shown by this record for the imported articles. The record is somewhat confusing in this respect and counsel have apparently proceeded in their arguments before us on the theory that more than one use has been shown for the articles of importation, the Government contending that the use for atomizer tops and locket sides is fugitive, while the importer insists as strenuously that this is a substantial use. A close examination of the record and of the testimony of the witness, Perlman, discloses that some of these articles of importation were sold for watch crystals, some to makers of lockets, and some to makers of atomizer tops. [Pp. 357, 358.]

Two of the judges differed sharply with the majority both as to fact and law. First, they said in their concurring opinion, the appeals court "is not justified in concluding that the evidence shows that there was a single use (a single class of uses is not found) for the merchandise involved. The court below tried the case upon the theory that there was more than one use shown and affirmatively found that the evidence did show more than one use. In this court, the case was argued with unanimity of opinion that there was more than one use shown, the Government contending that the use other than for watch crystals was fugitive. Unless the evidence is clear, the finding of the court below, which was supported by the Government here, should not be reversed." (Pp. 358, 359.)

Second, the concurring judges said, they did not "approve of the exclusive-use rule reiterated by the majority." (P. 359.) The reason for their rejection of the exclusive-use rule was stated succinctly in the concurring opinion as follows:

We believe the merchandise at bar should be classified under paragraph 230 as "all glass or manufactures of glass," not because it has one exclusive use, but because it has been processed from the raw material to a point where it has a distinctive character, name, or use different from that possessed by the original material, and that having undergone such processing it is immaterial that some one finds more than one use for it. [P. 359.]

It is a principle of tariff law that classification of like merchandise should be consistent. Plaintiffs argue for classification dependent on ultimate use of particular importations of like merchandise. However, this merchandise had taken on a form and shape, prior to importation, that has made it into articles *eo nomine* provided for in the law.

There seems little need to explore congressional intent. Buttons are among the oldest of *eo nomine* designations. This goes back to the first tariff act, that of 1789. Buttons have continued to be *eo nomine* provided for in successive tariff acts, with some delimitation from time to time as to material or as to type. There has been, however, throughout these statutory changes, continuing *eo nomine* provision for buttons not specially provided for. (Par. 1510, Tariff Act of 1930.)

There is a tendency, alike on the part of counsel and of courts, to extend judicial language, sound enough in the context of the case in which it was used, into a broad doctrine of wide application. Such extension, in this case, we reject. On the record before us, we are of

opinion that plaintiffs have not made their case. There is evidence of substantial and longstanding trade in merchandise, similar to this, as button blanks, partially finished, used in the button trade. There is also *eo nomine* provision of longstanding for such merchandise. We are of opinion that, on this record, the fact that a particular lot of like merchandise was used to make some product other than buttons, in this case, jewelry, does not take the merchandise out of the *eo nomine* provision of the tariff act.

We hold that these disks or blanks, partly processed, were properly classified as partly finished shell buttons, under the *eo nomine* provision for buttons, partly finished. The protests are overruled.